**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WENDY BALL, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:08-CV-0232 |
| | § | |
| DUTY FREE AMERICAS, INC.; | § | |
| CHRISTIAN LACROIX S.N.C.; | § | |
| and CHRISTIAN LACROIX NORTH | § | |
| AMERICA, LLC, | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Plaintiff Wendy Ball brings this case complaining of retaliatory discharge. Defendants Duty Free Americas, Inc. ("DFA"), Christian Lacroix S.N.C. ("CLSNC"), and Christian Lacroix North America, LLC ("CLNA") have filed a Motion for Summary Judgment [Doc. # 50] ("Motion").[1] Plaintiff responded [Doc. # 59], Defendants replied [Doc. # 62], and Plaintiff filed a surreply [Doc. # 68].[2] Having carefully considered the parties' briefing, the applicable legal authorities, and all

---

[1] Plaintiff originally sued two additional Defendants, Falic Fashion Group, LLC and Nicolas Topiol, but all claims against these Defendants were dismissed by joint stipulation on December 9, 2008. Order Granting Joint Stipulation of Partial Dismissal [Doc. # 49].

[2] The Court granted Plaintiff leave to file the surreply. *See* Doc. # 67.

matters of record, the Court concludes that the Motion should be **granted**.

## I. BACKGROUND

Plaintiff Wendy Ball argues that her employment with Defendants was terminated solely in retaliation for her refusal to comply with Defendants' instruction to perform an illegal act, in particular, to carry certain sample furs in her personal luggage in violation of customs laws.[3] Defendants argue that, before the dispute with Plaintiff over transport of the sample furs arose, they already had decided to terminate Ball's employment for multiple legitimate reasons.

Plaintiff was hired on November 1, 2005, as National Sales Manager (US) for Christian Lacroix, after being recruited by the three Falic brothers, who owned the Christian Lacroix fashion house.[4] She reported to Nicolas Topiol, CLSNC's Director.[5] Plaintiff was responsible for selling the Christian Lacroix fashion line in the United States and Canada.[6] Defendants state that "one of [Plaintiff's] biggest

---

3 Plaintiff originally brought a claim for age discrimination as well, but the parties agreed to dismissal of the age discrimination claim. Order Granting Joint Stipulation of Partial Dismissal [Doc. # 49]. Retaliatory discharge is the only pending claim.

4 Ball Affidavit (Exhibit 4 to Response), at 1-2, ¶¶ 2-5. Ball claims she worked for all three Defendants; Defendants dispute this assertion and contend that only CLNA was Ball's employer. The three brothers (Jerome, Leon, and Simon Falic) owned all three Defendants at all times relevant to this lawsuit.

5 *Id*. at 2, ¶¶ 4-6.

6 *Id*., ¶ 5.

perceived assets was her relationship with the retailer Neiman Marcus,"[7] which was Christian Lacroix's biggest United States client.[8]

Topiol terminated Plaintiff on February 21, 2007. The quality of Ball's job performance and the actual reason for her termination are subjects of intense dispute between the parties. Ball argues that her performance exceeded expectations, and relies heavily on sales data for Christian Lacroix's Spring/Summer 2007 Market. Data attached to an email in October 2006 shows that United States sales for the collection exceeded Defendants' budgeted sales by 13% and increased by 47% over the previous year's Spring/Summer Market.[9] Ball states that this was the last Market for which she was responsible before her termination.[10]

---

[7] Motion, at 14. *See* Simon Falic Deposition (Exhibit 5 to Motion), at 35 (Ball had a strong relationship with Neiman Marcus); Ball Deposition (Exhibit 1 to Motion), at 32 (in 1996, when Plaintiff first worked for Christian Lacroix, she was a Neiman Marcus employee fully salaried by an outside vendor, Christian Lacroix); Ball Affidavit (Exhibit 4 to Response), at 1, ¶ 2 (Plaintiff's first position with the Christian Lacroix line was as a boutique manager for Neiman Marcus).

[8] *See* Ball Deposition (Exhibit 1 to Motion), at 166 (Neiman Marcus was the largest single client of Christian Lacroix); Final Sales for Spring/Summer 2007 (Exhibit 20 to Motion).

[9] Email from Ball to V. Beaumont, *et al.*, dated Oct. 19, 2006 (Exhibit 14 to Response).

[10] Although Ball contends that her sales budget is "the only verifiable benchmark for Defendants' sales aspirations," Surreply, at 4, Defendants argue that their aspirations for company growth were much higher and that Ball's exclusive focus on having met her sales budget is "misleading and unpersuasive." Reply, at 7; Topiol Declaration (Exhibit 2 to Motion), at 2, ¶ 6 (Defendant's sales budgets "do not reflect or indicate (continued...)

Defendants present evidence that Ball's job performance was unsatisfactory. By February 2006, three months after Ball was hired, Topiol expressed concern about her attitude and capabilities.[11] Several months later, Topiol reprimanded Ball for sending an email about an invoice without first discussing the matter internally.[12] Topiol also expressed displeasure with Ball over pricing mistakes by employees under her supervision.[13] The record also reflects that Ball was anxious about how her job

---

10 (...continued)
its aspirations for the growth of the company," but "only reflect how much the company expects to sell in a specific season, so that adequate purchases can be made for that season and a proper seasonal budget can be created for the company"); *id*. at 2, ¶ 8 (Christian Lacroix "needed to diversify its business—mainly its department store business—to be able to grow the business to the levels the company aspired").

11 Email chain between Topiol and Falic brothers, dated Feb. 10-26, 2006 (Exhibit 11 to Motion), at 1 (Topiol states that Ball "is maybe capable of isolating problems but she clearly is not capable of solving them"); *id*. at 3 (Topiol writes, "I will check on [Ball's] comments as I take what she says with a grain of salt. At every collection, she makes a big stink to explain why she will fail at selling the collection.")

12 Email chain between Ball, Topiol, *et al*., dated June 13, 2006 (Exhibit 12 to Motion) (after Topiol tells Ball that an email to a third party is "unacceptable" and that he "would strongly recommend discussing this internally before answering and having [Louis Vuitton] in copy to your emails," Ball responds, "I apologize for overstepping my bounds with regard to this financial dispute.").

13 Email chain between Ball and Topiol, dated Sept. 15, 2006 (Exhibit 12 to Motion), at Bates-stamped page Ball 277 (Topiol tells Ball, "This is Serena's job under your supervision. This is a very big problem."). In attempting to identify the source of the problem, Topiol and Ball clashed further, with Topiol accusing Ball of attempting to justify the error and Ball telling Topiol, "[I]t appears that you have little interest in discovering the source of the error." *Id*. at Bates-stamped page Ball 283-Ball 284.

performance was regarded.[14]

Unbeknownst to Ball, by Autumn 2006 Topiol was making plans to replace her with a new hire. On November 9 and 10, 2006, less than a month after distribution of the sales data relied upon by Plaintiff, Topiol and the Falic brothers exchanged emails about hiring of a woman named Esther Terry Cohen.[15] Topiol reported that he had met with Cohen and that "she is ready to move and work with us starting January 1st." He then discusses negotiations for her compensation, requesting approval from the Falics, and states, "I want to close on this quickly and set our US business on the correct path." Shortly thereafter, Topiol specifically mentions his plan to terminate Plaintiff's employment: "Today we pay Wendy [Ball] close to $100K plus bonus. You cannot compare. ***Wendy [Ball] has to go.*** Terry [Cohen] has a very good track record and a very impressive Rolodex."[16] Simon Falic responded, "I agree, Wendy should go."[17]

About two months later, on January 5, 2007, Ball wrote an email that Topiol

---

14 Email from Ball to Topiol, dated Aug. 29, 2006 (Exhibit 16 to Motion) (Ball requests a meeting with Topiol and states, "I am concerned that I am not meeting your expectations of your vision for the future of Christian Lacroix.")

15 Email chain between Topiol and Falic brothers, dated Nov. 9- 10, 2006 (Exhibit 19 to Motion).

16 *Id*. (emphasis added).

17 *Id*.

considered unprofessional and negative. Ball sent the email, which discussed sales losses at Neiman Marcus and the contributing reasons, to Topiol and Veronique Beaumont, World Wide Commercial Sales Director for Christian Lacroix, with copies to seven others, including Simon Falic.[18] Simon Falic later responded to Topiol, copying the other Falic brothers and demanding that Topiol address the problems.[19] Topiol responded to the Falic brothers as follows:

> This email is a classic example of [Ball]'s negativity and unprofessionalism. I met with Terry [Cohen] today and we are moving forward. She is starting Monday [January 15th].
>
> As you very well know, [Ball's] emails are written by her to cover herself. This way, every problem is not her doing but everyone else's. We have discussed this various times and her attitude and negativity is not acceptable. Putting all those people in copy of this email is not appropriate and creates bad feelings where it should not be.[20]

Topiol then addresses substantively some of the specific issues raised by Ball.

Plaintiff states that, on January 11 or 12, 2007, she first learned that Defendants had hired Cohen.[21] At that time, Veronique Beaumont instructed Plaintiff not to

---

18 Email chain between Ball, Topiol, and Falic Brothers, dated Jan. 5-8, 2007 (Exhibit 13 to Motion).

19 *Id*.

20 *Id*.

21 Ball Deposition (Exhibit 1 to Motion), at 56; Charge of Discrimination (Exhibit 9 to Motion), at 2, ¶ 5.

attend briefings on the upcoming Paris Market that Plaintiff previously had been scheduled to attend.[22]

On January 17, two days after Cohen's start date, Topiol sent an email message to two Neiman Marcus managers, announcing Cohen's arrival to "our US team."[23] Plaintiff points out that this email does not identify Cohen's job title, and argues that this omission supports her argument that the decision to terminate her had not yet been made.

The parties' dispute over the transport of sample furs, which Plaintiff now claims was the ***sole*** basis for her termination, occurred the next day. On January 18, 2007, Barbara Theissen, Area Manager of Christian Lacroix in Paris,[24] emailed Plaintiff. In response to Plaintiff's request that the Paris employees make appropriate arrangements with Air France for Plaintiff's luggage "so that there will be no delay with the Carnet leaving for NYC,"[25] Thiessen states:

---

22 *Id*.

23 Email from Topiol to L. Hopkins (Neiman Marcus) and K. Dubas (Neiman Marcus), dated Jan. 17, 2007 (Exhibit 16 to Response).

24 Theissen Declaration (Exhibit 5 to Response), at 1, ¶ 2.

25 Plaintiff defines a "carnet" as "a temporary passport to transport sample goods across international [borders] without paying duties." Response, at 4 (citing 19 C.F.R. § 114.0 *et seq*.). CLSNC's interrogatory responses state that CLSNC "prepared a carnet to facilitate the transportation of its commercial samples to be temporarily entered into the United States," and that "[t]he furs which were not on the carnet were (continued...)

> André Lafontaine has to check with Air France if you can take extra luggage, two trunks + 3 suitcases. My travel agent [cannot] do it from here. Some fur pcs (about 5) will go into your suitcase, take the biggest one, or better, even two!!!! Otherwise the Carnet might be stuck in customs.[26]

The email then gives information about local transportation in Paris and luggage assistance at the airport. Plaintiff refused to transport the furs in her personal luggage because she believed such transport violated United States customs laws. That same day, she sent an email to Topiol, stating, "Nicolas, I have been asked to bring in merchandise for the NYC show in my personal luggage that is not on the Carnet. This is illegal. I refuse to break the U.S. Laws. Sincerely, Wendy Ball."[27]

The next day, January 19, Topiol authored an email to Ball and multiple other

---

25 (...continued)
given to Ms. Esther Terry Cohen to transport into the United States." Interrogatory Responses (Exhibit 26 to Response), at 4. CLSNC's interrogatory responses claim no knowledge regarding whether duties were owed on the furs. *Id*.

26 Email chain between Ball, Theissen, and Beaumont, dated Jan. 17-18, 2007 (Exhibit 23 to Motion). Thiessen states that she was instructed by Veronique Beaumont to tell Ball to bring the extra luggage. Thiessen Declaration, at 2, ¶ 4.

27 Email from Ball to Topiol, dated Jan. 18, 2007 (Exhibit 24 to Motion). The record contains conflicting evidence as to why the furs were not declared on the carnet. *Compare* Theissen Declaration (Exhibit 5 to Response), at 1-2, ¶ 3 (sensitive fur pieces were not declared on the carnet because furs are protected as "fish and wildlife" by the United States government and this classification "could delay the whole shipment at the airport for several days, or even weeks, which means [] that the collection makes it too late for order taking in the US market") *with* Topiol Deposition (Exhibit 1 to Response), at 88 (it was common practice to take products outside of the carnet at the last minute because they had come late to the showroom).

employees of Christian Lacroix, which stated:

> In order to be clear and avoid any confusion, Terry Esther Cohen has recently joined our team and will be heading the development of our Company for the Americas. . . . Going forward, and effective immediately, you are all to report to Terry.[28]

This email instructed Ball's staff to report to Cohen, therefore stripping Ball of her staff and authority.[29] Ball maintains that Cohen "willingly transported the undeclared fur samples in her personal luggage."[30] She alleges that, throughout the rest of January and February, she was harassed by Topiol and others for her refusal to carry the furs.[31]

In early February, Neiman Marcus reduced its business with Christian Lacroix

---

28 Email from Topiol to Ball, *et al*., dated Jan. 19, 2007 (Exhibit 19 to Response).

29 The Court notes that this email, like Topiol's earlier email to Neiman Marcus employees, does not specify Cohen's job title.

30 Response, at 11. *See* CLSNC's Interrogatory Responses (Exhibit 26 to Response), at 4, ¶ 16; Topiol Deposition (Exhibit 1 to Response), at 37-38.

31 Ball Deposition (Exhibit 3 to Response), at 195-97 (while in Paris, Beaumont and Cohen discussed with Plaintiff her refusal to carry the furs, stating it was "no big deal" and that Plaintiff was not "being a team player"); *id.* at 200 (Cohen was "huffing and puffing" about the matter); *id*. at 206-07 (on Plaintiff's return trip, Topiol requested that Plaintiff carry the furs back to the United States in her personal luggage as "a personal favor"); Ball Affidavit (Exhibit 4 to Response), at 3-4, ¶ 12 (Beaumont and Cohen "repeatedly harassed" Plaintiff for her refusal to carry the furs); Theissen Declaration (Exhibit 5 to Response), at 2-3, ¶ 7 (while in Paris, Thiessen heard Beaumont make "numerous comments about Ms. Ball refusing to carry the undeclared furs in her personal luggage"; Beaumont told Thiessen and other co-workers that she was "very mad" about the incident; Beaumont told employees "that Christian Lacroix needed to cheat on the laws like this").

by nearly 90 percent.[32] Neiman Marcus was Plaintiff's most significant client and, according to Defendants, a main reason for her hire.

Defendants terminated Ball's employment on February 21, 2007.[33] Topiol stated in his Declaration that this was his first opportunity to meet with Ball in person after the Neiman Marcus account reduction:

> By October 2006, I had already made the decision to terminate Wendy Ball. However, a replacement was needed before the termination could be implemented. Once Terry Cohen was located and the details of her contract were worked out in December 2006, the decision to terminate Wendy Ball was finalized and only the timing of the termination remained to be determined. I envisioned a brief of [sic] transition period, where both Terry Cohen and Wendy Ball could work together in transitioning the relationship with the CLNA customers—particularly Neiman Marcus.
>
> However, once Neiman Marcus informed me on February 6, 2007 that it was reducing its business from 8 to 1 doors, there was no other reason to forestall Ms. Ball's termination. As a result, I terminated Ms. Ball during my next opportunity to meet with her—on February 21, 2007.[34]

Ball states that, during the meeting in which he fired her, Topiol told Ball that her

---

[32] Topiol Declaration (Exhibit 2 to Motion), at 2, ¶ 10; Email chain between Topiol and Kate Dubas (Neiman Marcus), dated Feb. 5, 2007 (Exhibit 22 to Motion) (Neiman Marcus buyer forwards her fall order for one store, stating "[a]s the business gets healthier we look forward to discussing going back into some of the other markets").

[33] Charge of Discrimination (Exhibit 9 to Motion).

[34] Topiol Declaration, at 2, ¶¶ 9-10.

performance had been "outstanding."[35]

Plaintiff filed a Charge of Discrimination with the Texas Workforce Commission and the EEOC on April 18, 2007, alleging that she was discharged because of age discrimination. In other words, she declared, under penalty of perjury, that she was discharged for reasons other than her refusal to carry the furs in her personal luggage.[36] She filed the instant lawsuit on January 21, 2008, claiming that she was terminated because of age discrimination and because of her refusal to carry the furs and thus violate United States laws. On December 9, 2008, the parties agreed to dismissal of Plaintiff's age discrimination claim.[37] Retaliatory discharge is the only claim pending before this Court.

## II. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.[38] Summary

---

35 Ball Affidavit (Exhibit 4 to Response), at 4, ¶ 14.

36 Charge of Discrimination (Exhibit 9 to Motion).

37 Order Granting Joint Stipulation of Partial Dismissal [Doc. # 49].

38 *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d (continued...)

judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[39]

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."[40] The moving party, however, "need not negate the elements of the non-movant's case."[41] The moving party may meet its burden by pointing out "the absence of evidence supporting the nonmoving party's case."[42]

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.[43] "An issue is material if its resolution could affect the outcome of the

---

38 (...continued)
1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

39 FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

40 *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

41 *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075).

42 *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (internal citations and quotations omitted).

43 *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal
(continued...)

action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[44]

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party.[45] However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'"[46] The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.[47] Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden.[48] Instead, the nonmoving party must present specific facts which show "the existence of a genuine

---

43 (...continued) citation omitted).

44 *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

45 *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

46 *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999)).

47 *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002).

48 *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).

issue concerning every essential component of its case."[49] In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.[50]

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence.[51] A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.[52]

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."[53]

## III. ANALYSIS

---

49 *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).

50 *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

51 *See* FED. R. CIV. P. 56(e); *Love v. Nat'l Medical Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).

52 *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000).

53 *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (internal citations and quotations omitted).

Two issues are before the Court: First, whether Plaintiff has demonstrated a genuine issue of material fact that she was wrongfully discharged under Texas law; and second, whether Defendants DFA and CLSNC were Plaintiff's employers.

**A. Wrongful Discharge**

Plaintiff's wrongful discharge claim is brought under *Sabine Pilot Service, Inc. v. Hauck*, in which the Texas Supreme Court carved out a narrow exception to Texas' employment-at-will doctrine.[54] Under *Sabine Pilot*, Texas courts recognize a cause of action for wrongful discharge when the "sole reason" for the discharge was that the employee refused to perform an illegal act.[55] At trial, the plaintiff bears the burden to prove by a preponderance of the evidence that the discharge was for "no reason other than his refusal to perform an illegal act."[56]

Construing *Sabine Pilot*, the Fifth Circuit has laid out the following four elements of a *prima facie* case of wrongful termination: (1) the plaintiff was required to commit an illegal act which carries criminal penalties; (2) the plaintiff refused to engage in the illegality; (3) the plaintiff was discharged; and (4) the sole reason for the

---

54 *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985). Plaintiff originally brought a claim for age discrimination, but voluntarily dismissed the claim. *See* Order Granting Joint Stipulation of Partial Dismissal [Doc. # 49].

55 *Sabine Pilot*, 687 S.W.2d at 735.

56 *Id*.

plaintiff's discharge was the refusal to commit an unlawful act.[57]

The parties' dispute centers on the fourth element, in particular, whether Plaintiff's refusal to carry the furs in her personal luggage was the "sole reason" for her discharge.[58] Under *Sabine Pilot*, Plaintiff must prove that she was terminated "for no reason other than" her refusal to perform an illegal act.[59] "An employer who discharges an employee both for refusing to perform an illegal act ***and*** for a legitimate

---

[57] *White v. FCI USA, Inc.*, 319 F.3d 672, 676 (5th Cir. 2003).

[58] Regarding the first element, *i.e.*, that Defendants required Plaintiff to commit an illegal act carrying criminal penalties, there is some question as to whether Ball actually was required to put the fur samples in her personal luggage or whether bringing them into the United States in that manner was unlawful. Plaintiff incorrectly cites 19 U.S.C. § 545. Presumably, Plaintiff intends to rely on Title 18 of the United States Code, Section 545, which provides:

> Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or
>
> Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law--
>
> Shall be fined under this title or imprisoned not more than 20 years, or both. . . .

18 U.S.C. § 545.

[59] *Sabine Pilot*, 687 S.W.2d at 735.

reason or reasons cannot be liable for wrongful discharge."[60]

Defendants have presented strong evidence of multiple legitimate reasons for Ball's termination that pre-existed the dispute concerning Ball's refusal to perform any alleged illegal act. Ball has provided no meaningful proof to rebut that evidence.[61] First, Defendants have produced a written record of Topiol's decision to fire Ball as early as November 2006, in an email stating, "Wendy has to go."[62] Topiol, who was working in late 2006 to hire Cohen as Ball's replacement, clearly was dissatisfied with Ball's job performance at that time. Topiol expressed his view that Ball would be fired ***after*** the October 2006 release of the sales data upon which Plaintiff relies to demonstrate her alleged strong job performance,[63] and ***before*** Ball's

---

60 *Tex. Dep't of Human Servs. of State of Tex. v. Hinds*, 904 S.W.2d 629, 633 (Tex. 1995) (emphasis original).

61 In addition, Plaintiff had originally alleged another, illegitimate reason for her termination: age discrimination. *See* Charge of Discrimination (Exhibit 9 to Motion). This Court permitted Plaintiff to plead the inconsistent theories. *See* Memorandum and Opinion [Doc. # 27]. Nevertheless, the age discrimination claim is inconsistent with a *Sabine Pilot* claim. *See Guthrie v. Tifco Industries*, 941 F.2d 374, 379 (5th Cir. 1991) ("Because the refusal to perform an illegal act must be the sole reason for the plaintiff's discharge, Guthrie's claims of age discrimination and wrongful discharge are mutually exclusive.").

62 Email between Topiol and Falic brothers, dated Nov. 9-10, 2006 (Exhibit 19 to Motion).

63 Email from Ball to V. Beaumont, *et al.*, dated Oct. 19, 2006 (Exhibit 14 to Response). Defendants disagree with Ball's opinion that this sales data establishes her outstanding job performance. Topiol Declaration (Exhibit 2 to Motion), at 2, ¶¶ 6, 8.

January 2007 refusal to carry the sample furs in her personal luggage.[64] Moreover, Topiol's displeasure with her performance and attitude throughout 2006 is well-documented.[65] Texas is an at-will employment state and Topiol could fire Ball "for any reason or no reason at all."[66] Topiol's documented dissatisfaction with Ball's work clearly was a legitimate reason for her termination, whether or not Ball agrees with his assessment of her performance.

Moreover, Defendants' explanation focuses on the fact that Christian Lacroix's business with Ball's biggest account, Neiman Marcus, was reduced by nearly 90 percent in February 2007, just weeks before her termination. Defendants also have submitted Topiol's declaration, which states that after deciding to terminate Ball in 2006 he hired Cohen and was allowing for a transition period, especially for the sake of the Neiman Marcus account. However, when Neiman Marcus pulled most of its

---

64 Ball asserts that Defendants "actually decided to fire [Ball] ***after*** she refused to illegally transport the furs" and that, "[b]efore then, the Defendants had simply resolved to hire Cohen to work alongside Ball." Response, at 2, 20 (citing record evidence). In support of this argument, Ball cites to emails between Topiol and the Falic brothers regarding their intent to focus Ball on the department store business and their belief that Ball was incapable of leading Defendants' planned US expansion. However, these emails are not probative as they pre-date Ball's hire in November 2005, and none mention Cohen or an intent that Cohen and Ball work together.

65 *See supra* Section I (discussing Exhibits 11 and 12 to Motion, which document Topiol's various complaints about Ball throughout 2006, and Exhibit 13, in which Topiol refers to Ball as negative and unprofessional).

66 *Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 715 (Tex. 2003).

business, and with Cohen already in place, Topiol had no further reason to delay.[67] Ball has not contradicted this evidence in any way. This business loss was a legitimate reason for her termination.

Ball relies heavily on her assertion that Topiol called her performance "outstanding" when terminating her, but this assertion is insufficient to defeat summary judgment. First, Ball cites only her own unsupported and self-serving allegations.[68] Second, and most significantly, even if Topiol considered Ball's performance "outstanding," Texas law allowed him to terminate her employment for "any reason,"[69] such as the loss of the Neiman Marcus account.[70]

---

67 Topiol Declaration (Exhibit 2 to Motion), at 2, ¶¶ 9-10. *See also* Topiol Deposition (Exhibit 3 to Motion), at 145-46 (Plaintiff was spending her time mostly on the Neiman Marcus account; Plaintiff's "only value" was "with the Neiman Marcus account"; Topiol "felt that [Plaintiff] didn't have the ability to take the business outside of Neiman Marcus").

68 *See Hinsely*, 201 F.3d at 643(a party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary).

69 *Mission Petroleum*, 106 S.W.3d at 715.

70 *See Hinds*, 904 S.W.2d at 633 (an employer who discharges an employee for a legitimate reason or reasons is not liable under *Sabine Pilot*). Plaintiff argues that "inconsistent explanations" for an employment decision permit a jury to infer that the employer's non-discriminatory reason is pretextual. Response, at 12 (citing Title VII cases). In this case, however, Defendants' legitimate reasons for her termination are documented, whereas Topiol's alleged statement that Ball's performance was "outstanding" appears only in Ball's testimony. Moreover, the "sole reason" standard under *Sabine Pilot* differs drastically from the standards for establishing a Title VII violation.

Because Defendants have demonstrated several legitimate reasons for terminating Ball's employment, and Ball has failed to raise a genuine fact question on any of these explanations, summary judgment for Defendants is appropriate.

### B. Employer Status of DFA and CLSNC

Defendants argue that DFA and CLSNC are not employers of Plaintiff and should be dismissed from this action.[71] Because the Court grants summary judgment for Defendants, there is no need to address the parties' arguments regarding employer status.

## IV. CONCLUSION

For all of the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment [Doc. # 50] is **GRANTED**.

A separate final judgment will issue.

SIGNED at Houston, Texas, this **23rd** day of **March, 2009**.

Nancy F. Atlas
United States District Judge

---

71 Motion, at 21-27.